STATE of Missouri, Respondent,

v.

Roy Dudley JAMES, Appellant.

No. 49509.

Supreme Court of Missouri,

Division No. 1.

May 13, 1963.

Thomas F. Eagleton, Atty. Gen., Jefferson City, James J. Sauter, Sp. Asst. Atty. Gen., St. Louis, for respondent.

WESTHUES, Chief Justice.

On January 29, 1962, in the Circuit Court of Greene County, Missouri, Roy Dudley James was convicted by a jury on a charge of murder in the second degree. By the verdict, the punishment was fixed at imprisonment in the State Penitentiary for a term of ten years. A motion for new trial was filed and thereafter overruled by the court. Sentence was pronounced. The defendant then appealed to this court.

Defendant was represented by counsel throughout the trial. After an appeal was taken, defendant engaged new counsel, but no brief was filed for him in this court. In the motion for a new trial, defendant stated that the jury "let their emotions carry them away and convicted the defendant of adultery and for marrying the baby sitter and not" for murder. Complaint was made that certain exhibits which were not admitted as evidence were exposed to view of the jury; that Exhibit No. E should not have been admitted in evidence; that the trial court erred in not instructing on the theory that defendant killed deceased in defense of his home; that the prosecutor was guilty of improper argument; and, finally, that a new trial should have been granted on newly discovered evidence.

The evidence presented an unusual state of facts. Deceased, Kenneth Kyger, was married and had a wife and three small children (ages 3, 2, and 1). On May 5, 1961, prior to the date Kyger was shot (August 17, 1961), deceased and his wife separated. A divorce suit was filed and was pending on August 17. Mrs. Kyger and her small children moved from the place where they had been living in Springfield to another address, 1000 St. Louis Street. Mrs. Kyger went to work to support her children and employed Bonnie Maples, age 17, as a baby sitter and she lived with the family.

The defendant James was employed as a truck driver hauling milk. The evidence disclosed that he had a wife and three children in the State of California. About August 3 or 4, 1961, James moved in with Mrs. Kyger and her family and remained there until about 2:00 a. m., on August 17 when he shot and killed the deceased. Thereafter, James and Mrs. Kyger no longer went together. On October 11, 1961,

James married Bonnie Maples, the baby sitter. She was his wife on the date of the trial and testified for him.

The evidence as to what happened on the night of the shooting was substantially as follows: During the evening before the shooting, defendant and Mrs. Kyger drove to Republic, Missouri. On their way, Mrs. Kyger saw and waved to her husband. Bonnie Maples, a witness for the defendant, testified that she had been out with girl friends during the evening and arrived at the apartment about 12:30 a. m. Before she turned out the lights and while preparing to go to bed, she noticed a truck going up and down an alley next to the apartment. She did not notice at the time who was driving the truck. After she turned out the lights, she saw the truck being parked in the alley and thereafter saw a man walking toward the front of the apartment. She also noticed that the man was staggering and as he drew nearer, she saw that it was Kyger. Bonnie testified she then awakened Mrs. Kyger and the defendant. According to Bonnie, Mr. Kyger "came to the door and started kicking and beating it and cussing everyone and no one in the house said anything." Bonnie left by a back way and called the police. Mrs. Kyger, wife of the deceased, a witness for the defendant, testified that the defendant had lived in her apartment about two weeks before August 17, 1961, and that he paid part of the food and rent bills; that he had his meals and slept there; that he had all of his clothing in the apartment.

As to what occurred at the time of the shooting, Mrs. Kyger stated that she was awakened by Bonnie; that on looking out the window, she saw Mr. Kyger; that he came to the door and, "Well, what he done, he was ravin' around, he was wantin' in, let him in.

     *     *     *     *     *     *

"Q What was he doing to the door?

"A Well, he was poundin' on it right then but then he said to open it or he was goin' to come on in, he was goin' to bust it in, then he kicked it in."

Mrs. Kyger testified that after her husband entered the room, the defendant told him "to just stand right there"; then a shot was fired. The witness testified that her husband drank to excess and that he was a violent and dangerous man; that she had informed the defendant of her husband's propensities.

It was in evidence that the defendant had purchased a shotgun from one of his customers on the day before the shooting and that the vendor had given defendant some shells. When Mrs. Kyger was asked about the defendant having his personal belongings at her apartment, she gave the following testimony:

"Q Was his radio there?

"A Yes.

"Q His guns, the shotgun?

"A That gun was there, that one night, that night."

The State introduced evidence by police officers that when they arrived at the apartment, they found deceased's body lying near the door; that it was necessary to push the door open because the feet of the deceased were in the way. These officers stated that defendant told them that, when deceased entered, defendant told deceased, " 'Stand right there where you are.' "; that deceased started toward him and defendant fired. Defendant showed the police where he was standing when the shot was fired; the point was about thirteen feet from where the body was found. It was in evidence that before deceased attempted to enter the apartment, the gun (a 12-gauge shotgun), was lying on a dresser beside the bed. Defendant admitted he had purchased the gun on the afternoon before the shooting. When the gun was found by the police, it contained a live shell and an empty shell was lying on the floor. No weapon was found on deceased nor was one found in his truck.

Defendant testified that the following occurred after he was awakened:

"Q And what happened then?

"A Well, Ken came to the door and started pounding and bangin' and swearin' and sayin' 'Open the door,' he was goin' to kick it in, and all that.

"Q Could you tell what all he said, or not?

"A No, he was kinda—he was talkin' loud and kinda tongue-tied.

"Q Could you tell whether or not he had been drinking?

"A No, I couldn't say.

"Q After * * * what happened next?

"A Well, he kinda stopped and walked back to his pickup truck and then he come back to the door and he says, 'All right, open the God damned door,' or something like that, or he was going to kick it in.

"Q How could you tell he walked back to the truck?

"A Well, from where I was standing, in the corner, I could see out the front windows of the apartment, and the pickup truck was sitting, well like looking out that window. (Indicating) I was back away from the windows. He walked back over and opened the right hand door of his pickup truck, stepped over the wall that was sitting right there in front, then he come back over the wall and up to the door. I figured that he got something then out of the pickup truck to break the door open, or something.

"Q Then when he came back to the door, what did he do?

"A That's when he said, 'All right open the door or I'm going to break it in,' or something.

"Q What did you do?

"A Well, I * * * now, I think that's when I grabbed the shotgun.

"Q Did he kick the door in?

"A Yes, sir.

"Q When did you inject a shell in the shotgun?

"A I believe just as he was kickin' the door in.

"Q Did you pump it loud enough so he could hear it?

"A Yes, sir.

"Q After that he kicked the door in?

"A Yes, sir.

"Q Is that what you call a pump type gun?

"A Yes, sir.

"Q And it makes a clattering noise when you inject a shell, does it or doesn't it?

"A Yes, sir.

"Q After he kicked the door in, what did he do?

"A Well, he come into the room almost to the foot of the bed there and I said, 'Now stand right there,' and then he turned and saw me and started cussin' and started towards me.

"Q How did he start towards you?

"A Lunged. I thought he was goin' to come right over the corner of the bed on me.

"Q You heard some officers say you said he lunged there that night when they talked to you?

"A Yes.

"Q Is that true?

"A That's right.

"Q He lunged toward you?

"A Yes, sir.

"Q Is that when you fired this gun?

"A Yes, sir.

"Q Then what did you do?

"A I couldn't see anything then.

"Q Why couldn't you?

"A Well, the flash of the gun and it was dark in there, anyway, and I lost him for a minute, I couldn't see him, and I re-chambered the gun. I wanted to scare him and I came back up—and I didn't know where he was.

"Q When you shot the gun why did you shoot the gun?

"A To scare him. I wanted to hold him there for the police.

"Q Had you sent Bonnie or somebody to get the police?

"A Yes, sir."

Defendant admitted he knew that the Kygers had not been divorced. A doctor testified that Kyger died instantly as a result of the shooting.

■ On the night of the shooting, the police took pictures of the room and of the deceased. These were offered as evidence. The trial court, at defendant's request, excluded all exhibits except one marked Exhibit E. The point made in the motion for new trial, that the exhibits which were excluded were left exposed to view of the jury, is unsupported by the record. Such complaints do not prove themselves and if not supported by the record are without merit.

■■ The point that Exhibit E should not have been admitted must be ruled against the defendant. The trial court is vested with some discretion in admitting such evidence. Defendant says the exhibit was a blurred picture of the door and casing which were kicked in. If that be true, how was defendant prejudiced? Defendant, in his motion for new trial, did not point out in what respect the exhibit was prejudicial.

■ The trial court instructed the jury on murder in the second degree, manslaughter, and self defense. The court further gave an instruction with reference to good character of the defendant and one concerning the evidence as to the turbulent and violent disposition of the deceased. However, the defendant complains that the court failed to instruct the jury that the defendant had the right to protect his home. In the circumstances, as shown by the evidence, the defendant was not entitled to such an instruction. Defendant was an intruder. The deceased's children and his estranged wife were in the apartment. Defendant had no right to be there where, in fact, he was living in adultery in violation of the law. Sec. 563.150, V.A.M.S.

Defendant contends that "the jury of eleven women and one man let their emotions carry them away and convicted the defendant of adultery and for marrying the baby sitter and not for the crime he was being tried for."

■ The case against defendant could not have been presented to a jury without disclosing the circumstances and conditions surrounding the situation. Furthermore, the situation was of the defendant's own making. It was the defendant who brought before the jury the fact that he was living with deceased's wife and that he later married the baby sitter. The allegation in the motion for new trial, that the jury was carried away with their emotions, is unsupported by the record. The point is ruled against the defendant.

During the argument of the State's attorney to the jury, he stated that Wanda Kyger saw the deceased and waved to him while she was riding with the defendant on their way to Republic earlier on the evening of the shooting. Defendant says the statement was not supported by the evidence. For a sufficient answer to that complaint, we quote the evidence of Wanda Kyger on that point:

"Q All right. Now, this trip that you took to Republic that evening befor this occurred, I understood you to say you saw your husband pass on the highway and you waved at him that evening, is that right?

"A Yes."

Defendant, in his motion for new trial, stated that he should have been granted a new trial because of newly discovered evidence consisting of a photograph showing the location of the deceased's pickup truck. Defendant made no showing that such evidence could not have been obtained before trial. In fact, defendant's witnesses testified with reference to the parking of the truck. It is apparent that the photograph would have been but cumulative of other evidence produced by the defendant. The trial court's action in denying the motion was justified. State v. Pinkerman, Mo., 349 S.W.2d 951, l. c. 953(4–6).

We have reviewed all points preserved in the motion for new trial and such matters which we are required to examine by S.Ct. Rule 28.02, V.A.M.R. No prejudicial error appearing in the record, the judgment is hereby affirmed.

All concur.